Pages 1 - 33

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES DONATO

| | | |
|---|---|---|
| EXAMINATIONS INSTITUTE OF THE | ) | |
| AMERICAN CHEMICAL SOCIETY, DIVISION | ) | |
| OF CHEMICAL EDUCATION, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. C 17-3522 JD |
| | ) | |
| CHEGG, INC., | ) | |
| | ) | San Francisco, California |
| Defendant. | ) | Thursday |
| | ) | November 16, 2017 |
| _____ | ) | 10:00 a.m. |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:          FINNEGAN, HENDERSON, FARABOW
                         GARRETT & DUNNER, LLP
                        901 New York Avenue, NW
                        Washington, DC 20001
                   BY:  **MARGARET A. ESQUENET, ESQ.**
                        **SAMUEL EICHNER, ESQ.**


                        FINNEGAN, HENDERSON, FARABOW
                         GARRETT & DUNNER, LLP
                        Stanford Research Park
                        3300 Hillview Avenue
                        Palo Alto, California 943043
                   BY:  **MORGAN ELIZABETH SMITH, ESQ.**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


*Reported By:*   **Debra L. Pas, CSR 11916, CRR, RMR, RPR**
              *Official Reporter - US District Court*
              *Computerized Transcription By Eclipse*

*Debra L. Pas, CSR, RPR, RMR, CRR*
*Official Reporter - U.S. District Court - San Francisco*
*(415) 431-1477*

 1    **APPEARANCES:   (CONTINUED)**

 2

 3    **For Defendant:**          GREENBERG TRAURIG
                              190 University Avenue
 4                              Fifth Floor
                              East Palo Alto, California, 94303
 5                     BY:  **IAN BALLON, ESQ.**

 6

 7                              GREENBERG TRAURIG
                              4 Embarcadero Center
 8                              Suite 3000
                              San Francisco California 94111
 9                     BY:  **SARAH ELIZABETH BARROWS, ESQ.**
                          **THADDEUS CORCORAN HOUSTON, ESQ.**

10

11                              –   –   –

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **Thursday - November 16, 2017**                    **10:51 a.m.**

2                          **P R O C E E D I N G S**

3                             **---oOo---**

4          **THE CLERK:** Calling Civil 17-3522, Examinations

5    Institute of the American Chemical Society, Division of

6    Chemical Education versus Chegg.

7          **MS. ESQUENET:** Good morning, my name is Margaret

8    Esquenet --

9          **THE COURT:** Just one second.  Can I get my sheet?

10        (Brief pause.)

11         **THE COURT:** Okay.  Please.

12         **MS. ESQUENET:** Margaret Esquenet

13   representing plaintiff, Examinations Institute.

14         **THE COURT:** Esquenet?

15         **MS. ESQUENET:** Esquenet.

16         **THE COURT:** Esquenet, okay.

17         **MS. SMITH:** Good morning, your Honor.  Morgan Smith

18   for the plaintiff.

19         **MR. EICHNER:** Good morning, your Honor.  Sam Eichner

20   for the plaintiff.

21         **THE COURT:** All right.

22         **MR. BALLON:** Good morning, your Honor.  Ian Ballon

23   for the defendant.

24         **MS. BARROWS:** Good morning, your Honor.  Sarah

25   Barrows for defendant Chegg.

```
 1              THE COURT:  Barrows?

 2              MS. BARROWS:  Barrows.

 3              MR. HOUSTON:  Good morning, your Honor.  Thaddeus

 4   Houston for the defendant.

 5              THE COURT:  All right.  One of you come on up for

 6   each side.

 7              MS. ESQUENET:  Your Honor, are we starting with the

 8   CMC or the Motion to Dismiss?

 9              THE COURT:  Oh, I just have a couple Motion to

10   Dismiss questions.  Briefs are fine.  I just have a couple

11   things I wanted to ask.

12              MS. ESQUENET:  My colleague, Sam Eichner -- we put in

13   a notice that the younger attorney will be arguing the Motion

14   to Dismiss.  So this is my colleague, Sam Eichner.

15              THE COURT:  Great.  All right.

16         Tell me a little bit about your client, Mr. Eichner.

17              MR. EICHNER:  Good morning, your Honor.  My client is

18   part of a century old non-profit organization.  The Institute

19   is dedicated to advancing scholastic chemistry nationwide and

20   develops chemistry exams.

21         Now, these exams are incorporated into course curricula

22   all over the country.

23              THE COURT:  Now, I just had a -- I couldn't quite

24   tell, so just help me out here.  So this is not like the LSAT

25   Corp. or the SAT Corp.  These are not licensing or
```

1    credentialing exams, right?

2            MR. EICHNER:  These are not licensing exams, your

3    Honor.  These are exams that determine student's grades and vet

4    students in terms of their ability to perform on chemistry

5    subjects.

6            THE COURT:  And that's in high school and college?

7            MR. EICHNER:  In college --

8            THE COURT:  University?

9            MR. EICHNER:  Excuse me, your Honor.  In college as

10   well and sometimes in high school.

11           THE COURT:  Okay.  So they just kind of provide

12   teachers with tools to test chemistry learning; is that right?

13           MR. EICHNER:  That's correct.

14           THE COURT:  Okay.  So where are the students seeing

15   these tests, like, in classrooms or are they going to specific

16   centers that your client operates?

17           MR. EICHNER:  Your Honor, they are encountering their

18   tests when they are being tested.

19           THE COURT:  In classes.

20           MR. EICHNER:  Correct.

21           THE COURT:  Okay.  So, in other words, you are at

22   U.C. Berkeley and you're getting -- well, I don't know.  Let's

23   assume they use it.  All right?  So you're at some good

24   university and you're in Chemistry 1, and the professor hands

25   out her exam, and it turns out the exam is a model exam from

1   your client.  Is that sort of the way it works so far?

2          MR. EICHNER:  Correct.

3          THE COURT:  Okay.  And then 300 first-year chemistry

4   students take it and they can walk out with the exam, right?

5   Just no -- they are not told they can't keep it or anything?

6          MR. EICHNER:  Your Honor, the exams are secure, so

7   they are kept in locked storage up until the moment that they

8   are administered.

9          THE COURT:  No, no.  That makes sense from a cheating

10  perspective, but once they are passed out, can't a student walk

11  out with them?

12         MR. EICHNER:  No, your Honor.  They go right back

13  into locked storage after the test is concluded.

14         THE COURT:  The exams have to be handed in?

15         MR. EICHNER:  Correct.

16         THE COURT:  The students are told that?

17         MR. EICHNER:  That's correct, your Honor.

18         THE COURT:  All right.  And then -- so if a teacher,

19  an instructor gets these exams, they don't have to use the

20  exam.  They can pick one or two questions out of the exam and

21  copy those into an otherwise different test; is that right?

22         MR. EICHNER:  Well, your Honor, the way that they are

23  required to use the exams is in an exam setting.  They can't be

24  used for practice exams or instructions during class.  They are

25  to be used in a secure exam setting.

```
 1              THE COURT:  That's helpful.  But it's not an

 2   all-or-nothing proposition.  They -- an instructor can say:  I

 3   wonder what the Chemist Society exam looks like.  They get the

 4   exam and it has maybe 30 questions on it.  The instructor says:

 5   I only like two of these.  That person can use just those two,

 6   right?

 7              MR. EICHNER:  Generally speaking, your Honor, it's an

 8   all-or-nothing proposition.

 9              THE COURT:  It is.

10              MR. EICHNER:  It's an exam.  It's administered in

11   whole.

12              THE COURT:  And when an instructor wants to use these

13   exams, how would they get them?

14              MR. EICHNER:  Well, they will contact us and they

15   will sign a security pledge in connection with that order.

16              THE COURT:  What does the security pledge say?

17              MR. EICHNER:  Basically, that the exam -- every exam

18   copy has to be kept secure and that the exam copies are owned

19   by the Institute and controlled by the Institute and provide

20   certain instructions on how to administer the exam and retain

21   its security.

22              THE COURT:  And does it say you should not allow your

23   students to keep or otherwise copy or reproduce these

24   questions?

25              MR. EICHNER:  That's right, your Honor.
```

1          THE COURT:  It does say that?

2          MR. EICHNER:  It does.

3          THE COURT:  Okay.  All right.

4      Now, do you all consider Chegg to be a competitor of any

5  sort?

6          MR. EICHNER:  Well, your Honor, there's some --

7  certainly, some market substitution going on in an overlap in

8  what we do versus what they do, but --

9          THE COURT:  Let me back into that.  You all charge

10 for this service?  If a teacher wants to use your exam, do they

11 pay a fee of some sort?

12         MR. EICHNER:  They do your Honor.

13         THE COURT:  How much is that, roughly?

14         MR. EICHNER:  It's not a particularly high fee, your

15 Honor, but I can't recall the exact number.

16         THE COURT:  Okay.  So there is a fee involved for

17 using the -- your client's exam.  Okay.

18         MR. EICHNER:  That's right.

19         THE COURT:  So how do you compete with Chegg?

20         MR. EICHNER:  Well, we only compete to the extent we

21 both create a certain amount of educational content.  That's --

22 as I understand it, that's not what Chegg does primarily, but

23 there is probably some small overlap.

24         THE COURT:  Okay.  Do you consider Chegg to be a

25 competitor?

1          MR. EICHNER:  I would not, your Honor, not primarily,

2     but there is some competition.

3          Again, Chegg does lots of different things.  So,

4     certainly, some of those services would compete with us, but

5     we're fundamentally different organizations.

6          THE COURT:  Okay.  All right.  So, thank you.  That's

7     useful.

8          On the -- you have a false advertising claim; is that

9     right?

10          MR. EICHNER:  That's correct.

11          THE COURT:  I'm just having trouble seeing how your

12     client is in a false advertising relationship with Chegg.  Can

13     you tell me more about that?

14          MR. EICHNER:  Absolutely.  The Institute has

15     identified a particular advertisement.  Specifically, a line of

16     text on top of an image, the text is "snap a picture" and there

17     is some other text there as well.  And then there is a photo

18     below it showing what the students are supposed to snap a

19     picture of.  And that advertisement essentially gives students

20     instructions on what to do with Chegg's service.

21          What it doesn't say is that students, by doing this, will

22     necessarily infringe copyright.  They essentially have to.

23     There is hardly ever a situation where a student would

24     encounter a question where it wouldn't infringe copyright to

25     upload that question and students aren't told that.

1          **THE COURT:**  But you know that false advertising has a

2     more direct flavor to it, which is:  Use this -- you know, a

3     company says:  Use this product and your shirts will be

4     blindingly white.  And it turns out they are not blindingly

5     white because the company lied.

6          This is a little -- this is more of a non-disclosure about

7     the potential risk of a copyright infringement violation.  I'm

8     having a very hard time understanding how that amounts to false

9     advertising.

10          **MR. EICHNER:**  Well, your Honor --

11          **THE COURT:**  What is the misleading statements that is

12     deceptive to consumers?

13          **MR. EICHNER:**  Right.  So It's false by implication.

14     What it does is shows students what they are supposed to do and

15     show a picture of, really, what looks like an exam booklet.  So

16     it's telling students to do something that they really aren't

17     supposed to do.  But given the --

18          **THE COURT:**  All right.  So it's just an ad that

19     motivates bad behavior, but how is that false advertising?

20          **MR. EICHNER:**  Well, your Honor, it really does

21     deceive students because they rely on Chegg's sophistication

22     and they rely also on the educational context that this is

23     taking place.

24          Copyright is, of course, pretty complicated and it's even

25     more complicated when you get into the educational sphere.

1          **THE COURT:**  Let's stick with false advertising.
2    That's your claim.

3          **MR. EICHNER:**  Absolutely.

4          **THE COURT:**  The other thing that's bothering me is I
5    don't see how your client was in any way the victim of false
6    advertising.

7          **MR. EICHNER:**  Right.  And I will explain that, your
8    Honor.

9          The point I want to make is copies are given out in
10   classrooms of copyrighted content.  There is an exception for
11   that and that just muddles the issue further.  And Chegg is
12   taking advantage of that confusion under the educational
13   context.

14         But in terms of the harm we suffered, our exams are
15   secure.  So when they essentially encourage users to send
16   copies of our exams to Chegg, they get compromised and they get
17   destroyed because their value is in their secrecy and in their
18   security.  So it's harming us directly.

19         **THE COURT:**  I just -- I'm just -- and I'm going to
20   turn to your colleague here in a moment, but I -- that doesn't
21   add up to false advertising for me.  I'm not following that.

22         How about one last pitch and then we're going to hear from
23   the defendant, or you can say "submitted" if you don't want to
24   do anything else.

25         **MR. EICHNER:**  Your Honor, I understand there is some

1   hesitation, but, you know --

2          THE COURT:  I think hesitation is soft-pedaling a

3   bit.  I'm frankly skeptical.

4      So just take your best shot about why I should open my

5   eyes more clearly and see what you're saying.  I just don't see

6   it.

7          MR. EICHNER:  Right.  Well, the other side to --

8   there are really two claims going on here, your Honor.  One is

9   the false advertising.  The other is false association.

10     And, you know, students are just as easily led to believe

11  that ACS has authorized this photograph function to take place.

12  And, in fact, Chegg does license content from various

13  providers.  It has admitted as much.

14     So there is a real question of, you know, has ACS signed

15  off on this?  Can students do this?

16     And, in fact, there are, you know, books on Chegg that are

17  ACS publications and they say "Chegg Study" or "Chegg Study

18  Material."

19         THE COURT:  Let me be slightly provocative.  And I

20  don't think you need to answer this now, but it seems like you

21  might have a great case against the student pirates who are

22  actually doing what you consider to be the bad behavior.  You

23  know, you might say Chegg seems a little mercenary about it and

24  they are reaping the -- reaping ill-gotten gains from somebody

25  else's poor choices, but you're not actually -- as I understand

1    it, and you tell me if I'm wrong, you're not saying that Chegg

2    itself is poaching the exam questions.  They are not going in

3    there and picking up exams left on desks or sending in fake

4    students whose mission is just to covertly photograph the

5    exams.  You're not saying anything like that.

6          MR. EICHNER:  No, your Honor.  We haven't pled

7    anything like that.

8          THE COURT:  You're saying that they are inducing the

9    students to feed them your protected materials.

10         MR. EICHNER:  For the most part.  And, certainly,

11   discovery would tell us whether they are populating their

12   database of infringing content directly.  They may very well

13   be, you know, seeding this database in order to encourage

14   students to sign up.

15         THE COURT:  One last word.  What is the harm -- I get

16   sort of the intellectual property harm, but is there a domestic

17   value?  How much money is this supposedly costing your client?

18         MR. EICHNER:  The Institute is a non-profit, your

19   Honor.  We're not making millions and millions of dollars every

20   year, but, certainly, we have had to recall exams.  We have to

21   go through a very arduous process of creating a new exam once

22   it's compromised.  There is psychometric evaluation involved

23   and norming, as it's called, peer review.  Certainly, it's

24   complicated and it's expensive.

25         You know, the Institute is definitely suffering and there

1   is --

2          **THE COURT:**  But for UCL purposes, you don't get

3   damages.  So are you looking just for an injunction under the

4   UCL?  I don't see what your restitution claim is going to be.

5          **MR. EICHNER:**  Well, certainly, we have had to expend

6   significant costs recalling the exams.  And that is one area

7   where we would like to be made whole.

8          **THE COURT:**  All right.  Thank you.  That was very

9   helpful.

10      Mr. Ballon.

11          **MR. BALLON:**  Yes.

12          **THE COURT:**  You've heard our discussion.  Anything

13   you want to highlight?

14          **MR. BALLON:**  Well, your Honor, I would say that the

15   false advertising claim really is a copyright claim.  It's

16   preempted by *Day Star*.  The allegation is copyright inducement.

17          **THE COURT:**  Well, let me just jump in.  I mean, isn't

18   there a simpler answer, that isn't this a false advertising

19   claim?

20          **MR. BALLON:**  Yes.  Absolutely.

21          **THE COURT:**  I don't know why I have to go through a

22   whole analysis for something that may not be adequately alleged

23   on a simpler basis.

24          **MR. BALLON:**  Yes, your Honor.  Yes, your Honor.  It's

25   false.

1            THE COURT:  So what is your client doing?  Is it
2    giving students bounties for these illicit exam harvests?
3            MR. BALLON:  No, no.  Absolutely not.  What we're
4    doing is what Google does, what YouTube does, what eBay does,
5    what Uber or Lyft.  This is the  --
6            THE COURT:  None that necessarily means it's good.
7    Just because a crowd is doing it doesn't mean it's a good
8    thing.
9            MR. BALLON:  But there's case law that says that just
10   because the copyright owner doesn't like the Digital Millennium
11   Copyright Act, they can't sue.  You know, they have to go to
12   Congress if they want to change it.
13           THE COURT:  Just on a more simple level.  Why would a
14   student even go through all this for Chegg?
15           MR. BALLON:  A student --
16           THE COURT:  This is a lot of work.  They have got to
17   copy this thing and do this and see somebody at Chegg and turn
18   it in.  They must get a reward or something, a discount.
19           MR. BALLON:  No, no, no.
20           THE COURT:  Why would they do it?
21           MR. BALLON:  Because they want answers to questions.
22   The simple answer is most people who use this service are
23   students who are dealing with complicated math and chemistry,
24   other kind of science questions.  They want a tutor.  And in
25   the age of the internet and mobile phones, they use a service

1    like Chegg, where they are matched with an independent expert.

2    A student uploads a question and the question can be typed or

3    it can be photographed and uploaded.

4         **THE COURT:**  Okay.  So Chegg is not like -- it's not a

5    test prep company per se like Kaplan or something like that.

6    It's more of a one-on-one.  I'm taking chemistry at this

7    school.  I'm having a hard time.  Can you help tutor me?  Is

8    that the model?

9         **MR. BALLON:**  In a way, but it's the sharing economy

10   because the experts are not -- are not Chegg employees.  So

11   it's essentially matching student questions with independent

12   experts who help answer the questions.

13        **THE COURT:**  But who are these experts?  Is it crowd

14   sourced answers or is it --

15        **MR. BALLON:**  No, no.  They are people who will sign

16   up.  Just like you can sign up to be a Lyft driver, you can

17   sign up to be an expert and you provide an answer.  And so the

18   student will upload a question.

19        Now, these tests, obviously, are not secure.  If they were

20   secure, they wouldn't be all over the world.  And we did

21   provide and ask the Court to take judicial notice of the

22   article by the current and former director of Examinations

23   Institute, one of whom already submitted a declaration in this

24   case identifying this problem, long pre-dating anything that

25   Chegg had anything to do with.

1    So students are getting these exams.  Chegg will take this

2 down immediately, if identified.  So if a copyright owner

3 submits a DMCA notice, putting aside whether these questions

4 are factual or entitled to copyright protection, Chegg doesn't

5 care.  If it gets a notice, it takes it down.

6          THE COURT:  All right.  Now, you're telling me Chegg

7 has never declined a request and has immediately taken down the

8 exam question when notified by somebody like your plaintiff

9 here.

10          MR. BALLON:  Obviously, I can't speak to

11 everything --

12          THE COURT:  That's the policy.

13          MR. BALLON:  -- that's not before the Court.

14    They comply with the Digital Millennium Copyright Act.  If

15 there is a notice that meets the statutory standards, they

16 always take it down.

17    With respect to this case, when the plaintiffs have

18 identified their questions, we have taken them down usually

19 within 24 hours or less.

20    And Chegg has no interest in helping students cheat.

21 That's not their business --

22          THE COURT:  Can I ask you this?

23          MR. BALLON:  Sure.

24          THE COURT:  When a student is -- this is all for

25 background.  I know this is 12(b)(6), so don't panic about

1   anything.

2       This is an interesting area and the technology or the

3   business model is new to me and I -- you didn't have the space

4   to kind of explain it enough in the papers, so I want to make

5   sure I understand.

6       So when the student says:  Wow, I just had this chem exam.

7   I don't think I did very well.  Here are the three problems

8   that bothered me the most.  I'm going to go to my independent

9   advisor at Chegg and get some guidance on this.

10      Is that sort of the --

11          **MR. BALLON:**  No.  More typically it would be a

12  student taking a class who doesn't understand a question,

13  doesn't understand something in a study guide.

14      Now, for example, Chegg has many study guide questions

15  that it licenses.  Most of the major academic publishers have

16  licensed Chegg to make their study guides available and they

17  provide context because the typical student looking at a

18  question, looking at a study guide may still not understand it,

19  so they want tutoring.

20      In the physical world, you know, you find a Berkeley

21  student.  You meet.  In today's world you can go to a site like

22  Chegg and you say:  I don't understand this.  Can you explain

23  it?  Show me the analysis.

24      And so it's an online process, but Chegg has no interest

25  in promoting cheating and Chegg has no interest --

1      **THE COURT:**  When do these exams make their way to

2  Chegg?  I get everything you're saying, but I just assumed a

3  student, like, cratered on an exam and said:  I really need

4  guidance on this.  I'm going to copy these three questions so

5  somebody can tell me what I did wrong.  Is that what's

6  happening?

7      **MR. BALLON:**  Well, first of all, I have no idea.  My

8  client never heard of the plaintiff until they got a letter

9  saying we're going to sue you --

10      **THE COURT:**  I'm just talking about a kid having a bad

11  day in chem.  It's mid-term and that person has hit the wall.

12      Tell me why anybody is bringing exam questions to Chegg,

13  just a hypothetical student.

14      **MR. BALLON:**  I mean, most of them are not.  Most of

15  the questions are study questions.  They are working on a study

16  guide.  They are dealing with their work.

17      **THE COURT:**  It has nothing to do with the plaintiff.

18      **MR. BALLON:**  Yeah.  So with respect to the exam

19  questions, I mean, it appears that the exam -- students have

20  walked out with them.  Maybe one student gives it to another.

21  We really don't know.

22      All we know is, you know, someone uploads it to Chegg.

23  It's very much like uploading, you know, an offering to eBay or

24  uploading a video to YouTube.

25      **THE COURT:**  I understand.  That student is saying to

1    Chegg:   Please help me understand the answer.

2              **MR. BALLON:**  Yes.   Right.   And they would --

3              **THE COURT:**   And Chegg provides an answer.

4              **MR. BALLON:**  Well, not Chegg.   An independent --

5              **THE COURT:**   An independent expert provides an answer.

6    All right.   Fine.

7         Then at any point is Chegg able to tell right way:   Oh,

8    this is a protected question from the Examinations Institute of

9    the American Chemical Society?

10             **MR. BALLON:**  Well, if Chegg notices that, then on its

11   own initiative it takes it down.   But, you know, there are

12   hundreds of thousands of uploads.

13        It's very similar to YouTube.   And, in fact, in the *Viacom*

14   *v YouTube* case, Viacom submitted 100,000 take-down notices to

15   YouTube on one day in the lawsuit to make the point:   Look,

16   YouTube is a terrible infringer.   And YouTube, within about 72

17   hours, took down those 100,000 items.

18        Obviously, if Chegg sees something and they see a

19   copyright notice and they know it's not licensed, they will

20   take it down.

21        But the reality is most of the copyrighted -- in fact,

22   almost all of the copyrighted material that is there is

23   licensed because it comes from major publishers who have

24   licensed their study guides to Chegg.

25        Plaintiff honestly never heard of -- my client never heard

```
 1   of the plaintiff before we got a cease and desist letter.  So
 2   it's not like they would know it.  And if an independent expert
 3   sees something -- you know, since this lawsuit we have told
 4   independent experts:  Hey, if you see the same Examination
 5   Institute, you know, don't answer the question.  Let us know.
 6        But that's only because we became aware of it as a result
 7   of the lawsuit.  Prior to the lawsuit, we had no idea this
 8   material was up there.  There is thousands or hundreds of
 9   thousands of questions that are out there, and unless we know
10   about it -- and that's how the DMC works.  Unless a copyright
11   owner sends the DMC a notice or unless a Chegg employee looks
12   on the website and says:  Wow, that looks like it belongs to
13   someone and we don't have a license, we don't know to take it
14   down.
15        THE COURT:  Let me float an idea here and anybody
16   else who wants to come up from the plaintiffs can join us,
17   although Mr. Eichner is doing a wonderful job.
18        It sounds to me -- let me talk out loud here.  Okay?  You
19   had a problem and from what I'm hearing, Mr. Ballon, and you
20   tell me if you disagree with all this, his client has been
21   pretty responsive.  So if they see -- if the snapshot that
22   Chegg gets says "Copyright Examination Society," they have been
23   instructed don't touch it.  Don't put it up.  Don't post it and
24   decline to answer.
25        Is that right, Mr. Ballon?
```

1          **MR. BALLON:**  Yes.  Since this lawsuit we have

2    actually told our experts --

3          **THE COURT:**  All right.  There is no threat of ongoing

4    conduct.  We're just talking out loud here.  Okay?

5      If they had some indication that it's your property, they

6    are not going to do anything with it.  Now, they can't always

7    tell, apparently, and you can send them a letter saying:  Take

8    this down.  So there is a high degree of cooperation.

9          Does this open the door for resolving this and not having

10   to spend a huge amount of time?  This is an unusually

11   cooperative-sounding relationship.  You both are in a position

12   where you might be able to work this out.  What do you think?

13         **MR. EICHNER:**  Well, your Honor, ultimately I hope

14   that we can.  But I think there are some facts that need to be

15   flagged here.

16     You know, first, dozens of these photos have our copyright

17   notice blatantly listed on them at the bottom.

18         **THE COURT:**  Right now.  If I went on right now, I

19   could see Exam Society materials on Chegg's website; is that

20   what you're saying?

21         **MR. EICHNER:**  Today, your Honor, yes, you would be

22   able to see those materials.

23         **THE COURT:**  Have you identified those for the

24   defendant and said these should come down?

25         **MR. EICHNER:**  It's been ongoing, your Honor.  There

1    are at this point thousands that we have identified and it's

2    become a logistical difficulty because there are just so many.

3         **THE COURT:**  One point is you two need to work out

4    some way of -- assuming the defendant is cooperative, you need

5    to work out some way of jointly identifying and removing your

6    materials that are still on the web.  It seems like a

7    reasonable thing.

8         **MR. BALLON:**  We have certainly -- we've offered to do

9    more than the law requires.

10        The law requires that if they identify something, we take

11   it down or if we see it, we take it down.  We fully comply with

12   the DMCA.

13        We've also offered to go the distance because the reality

14   is they have confidential tests.  We don't know what they are.

15   And 99 out of 100 times they say this is infringing and we

16   wouldn't know.

17        We would -- they have given us a couple of search terms

18   and we have -- we have agreed proactively to search for those.

19        **THE COURT:**  You can search those in images?

20        **MR. BALLON:**  Well, that's the problem.  You can't

21   fully search images and that is the problem.

22        But they have given us two terms.  We've searched them.

23   We've pulled things down.

24        But, you know, the broader problem is, really, they have

25   to tell us --

1          THE COURT:  One step at a time.

2      Okay.  So, look.  It seems to me on Point A they have

3  stopped posting anything that they are aware of.  It might not

4  be perfect, but you can help them out with that.  They would

5  like to stop posting.

6          MS. ESQUENET:  Just yesterday we sent, I think,

7  another 300 links or so and we got no response from Mr. Ballon.

8          THE COURT:  That was just yesterday.

9          MR. BALLON:  No.  Actually, they were all taken down

10  yesterday, your Honor.  All 300 were taken down yesterday.  I

11  apologize.  It came --

12          THE COURT:  They were all taken down?

13          MR. BALLON:  I sent it to the client.  Everything was

14  taken down yesterday.

15          MS. ESQUENET:  But I think we need to back up a

16  little --

17          THE COURT:  Hold on.

18          MR. BALLON:  And 148 of 149 were duplicates.

19          THE COURT:  The numbers keep going up.

20          MR. BALLON:  No, no.  I mean, they sent us 300 --

21          MS. ESQUENET:  But --

22          MR. BALLON:  -- but 149 -- 148 of 149 links were

23  duplicates.  So it's 300.  That's really, actually, about

24  150 --

25          MS. ESQUENET:  That's not -- that's not --

1          MR. BALLON:  -- but all of them were taken down.

2          THE COURT:  We're not at a school auction.  One at a

3     time.  Let me work this out here.

4          MR. BALLON:  My apologies.

5          THE COURT:  That's okay.  I'm getting the sense that

6     you all have a lot of goodwill and common ground to get this

7     solved without having to go through a prolonged course of

8     litigation.

9          Now, are you interested in doing that?

10         MS. ESQUENET:  Why don't I take this?

11         I think that there is two important things here.  First,

12    I'll let Sam handle the factual issues because I think there is

13    a little bit of confusion --

14         THE COURT:  He did a fine job.

15         MS. ESQUENET:  -- with respect to who is posting this

16    material, and I think that's a very important issue.

17         THE COURT:  Okay.

18         MS. ESQUENET:  But I promised Sam that he would be

19    allowed to argue this, so I will let him handle that.

20         But with respect to a potential resolution to the

21    conflict, the Exams Institute has been open to it.  We -- we

22    sent a couple of letters.  We were basically --

23         THE COURT:  Couple?  You sent 300.

24         MS. ESQUENET:  We sent 300 links.  That's a different

25    issue.  And actually, again, there are so many different issues

 1  here, but they weren't duplicate links.

 2          **THE COURT:**  I want to push back on that.  Let me just

 3  interrupt.

 4      I understand there are a lot of issues, but what I'm

 5  hearing is a defendant -- and this is -- look, I see hundreds

 6  of cases.  All right?  And I will play this card, although it

 7  sounds a little condescending.  I see a lot more than you do.

 8  This is atypical, particularly in copyright, for a defendant to

 9  be, you know, so ready, willing and able, at least from what

10  I'm hearing, to make this right.

11      This is a golden opportunity for you to get what you want

12  without having to torture yourself and the other side and take

13  up a lot of resources and energy on something that you can get

14  maybe with a couple day's worth of discussion.

15      So what is it -- now, let's assume you can get all the

16  notices taken down and you work out some kind of harmonization

17  so that if something does pop up, you have a fast track to

18  Chegg and they are on it within 24 hours.  Whatever.  What is

19  it that's left that gives you concern?

20      Now, they can't police the students.  I don't know what

21  they could do.  Maybe you do.  I don't have any ideas on that.

22          **MS. ESQUENET:**  We're not actually asking them to

23  police the students.  But we feel that an important difference

24  than YouTube is that these questions do not get posted on the

25  service until after Chegg reviews them.

1    So it's the -- the students aren't posting it.  If you

2    have post a video on YouTube, it's up as soon as you're done.

3    You've published and it's up, right?  That's not the way Chegg

4    works.

5        Chegg sends these materials to one of their employees, one

6    of their experts.  And only after the expert has reviewed the

7    material, answered the question, does the Chegg employee post

8    these materials.  It is not the same as the other services that

9    Mr. Ballon was referring to.

10        **THE COURT:**  I will take that for the sake of

11    discussion, but -- and I'm not being glib, but what difference

12    does it make?  They are not willing to do anything that has

13    your name on it.  Why don't we focus on  --

14        **MS. ESQUENET:**  We actually -- we've made settlement

15    proposals to Chegg and they have not been well received, along

16    the lines that we're talking about.

17        **THE COURT:**  Is that right?

18        **MS. ESQUENET:**  Well, you know, I don't want to speak

19    for Mr. Ballon because he feels, I think, differently in terms

20    of where we are on the settlement issues, but we have certainly

21    discussed some of the more practical ways of potentially

22    addressing this problem.

23        But then there are others your Honor that have not been

24    able to be worked out, but I don't feel -- under Rule 408 I

25    don't feel I can say more.

```
 1              THE COURT:  That's fine.  All right.  Well, I'll tell
 2   you what --
 3              MS. ESQUENET:  If Mr. Ballon would like to say
 4   more --
 5              THE COURT:  Look.  Who would you like as a magistrate
 6   judge?  Do you have any preferences?
 7              MS. ESQUENET:  We have found Judge Spero to be a
 8   particularly effective mediator.
 9              THE COURT:  Do defendants have any preferences?
10              MR. BALLON:  Judge Spero or Judge Beeler.
11              THE COURT:  Okay.  I will send you to Chief Judge
12   Spero.  Okay?  And I will ask him to see if maybe he could see
13   you sooner rather than later.  He's a very busy judge, as you
14   know.  He's in demand.  Maybe he will be able to set you in.
15        My sense is this is a window that should not be closed
16   without a lot of effort.  Now, maybe you close it.  I don't
17   know.  That's fine.  You close it, you close it and we go to
18   stage two.  Okay?  No one is losing anything by doing this.
19        However, I have heard enough to be more than satisfied
20   that I think you can work this all out and I think it's better
21   to do it before the fees and costs start racking up, because I
22   don't want that to become an independent issue, both sides.
23        That affects both sides, you've got your stake in the case
24   and the defendant gets its stake and before you have know it,
25   that becomes the problem, not the substance.  And we can avoid
```

1    that, I think, by taking a good faith, you know, run.

2         You both seem on top of the case.  You both have your

3    viewpoint and you both are experienced enough to see if you can

4    work something out.

5         So my proposal would be you take that opportunity.  Okay?

6    In the meantime, you're not exposing yourself.  I would ask the

7    defendant to keep doing what it's doing, apparently, which is

8    taking everything down that it can find, either on its own or

9    when you tell them.  Okay?  So you're not going to be losing

10   anything in terms of stuff piling up on the internet.  And

11   while that's happening -- and it probably would be, I'm

12   guessing -- you know, I would just be conservative and say

13   probably early January before you can see Judge Spero.  You

14   would at least know your materials that you value are not being

15   wholesale published.  Okay?

16        **MS. ESQUENET:**  Understood.

17        **THE COURT:**  It's not going to be perfect, but you're

18   not going to get that anyway while the case being litigated.

19   And then you can go see Judge Spero and see if you can work

20   something out.  How is that?

21        **MS. ESQUENET:**  I think that sounds reasonable.

22        In addition, if it's possible -- like I said, we keep

23   finding new materials.  So if to the extent that the experts

24   that Chegg has engaged to answer these questions, if they could

25   be reminded not to answer --

1          THE COURT:  Okay.  Mr. Ballon how about telling

2     your --

3          MS. ESQUENET:  We're coming into final season and

4     that's important.

5          THE COURT:  That's true.  Yes.

6          MS. ESQUENET:  You were asking earlier, what's the

7     security around these questions.  These exams are proctored.

8     Each exam has a unique individual serial number.  There's

9     substantial security around these questions.

10         THE COURT:  All right.  Makes sense.  Would you be

11    willing to remind all the chem experts that they need to not

12    post or respond to Examination Society?  Is that the way I say

13    it?

14         MS. ESQUENET:  Yes.  Examination Society.  American

15    Chemical Society, Division of Chemical Education.

16         THE COURT:  Okay.  Sounds like --

17         MR. BALLON:  We've done it.  We can send a reminder.

18    They are not employees.  They are independent users.

19         THE COURT:  I know you both are passionate about this

20    point.  It is not necessary to resolve that now.  I understand

21    that.  Nobody is losing anything.  You say "employee."  You say

22    "independent contractor."  That -- those stakes are preserved.

23    Okay?  I will get to them if you need to.

24       Is your client willing to do that?

25         MR. BALLON:  Certainly.

1          THE COURT:  All right.  So if we do that, can we put

2    everything on ice and let you talk on the resolution of the

3    settlement process?  Is there anything you feel like you need

4    in the short term?

5       You know what they are doing.  You know all that.  I don't

6    know if there is anything you need, but what do you need?

7          MS. ESQUENET:  The one thing we would ask, your

8    Honor, if you would enter the protective order that we

9    requested when we filed the Complaint because we did provide

10   your Honor with -- with sample questions and sample exams.

11         THE COURT:  Did you file them under seal?

12         MS. ESQUENET:  We filed under seal and we filed a

13   redacted version for public consumption, but the --

14         THE COURT:  You're not thinking about a protective

15   order for discovery?

16         MS. ESQUENET:  Obviously, we would want that

17   eventually, if necessary.  But, no, there was a motion to seal.

18         THE COURT:  Consider it granted.

19         MS. ESQUENET:  Thank you.

20         THE COURT:  Okay.  That's it?

21         MS. ESQUENET:  I think so.  Let me check my list.

22         THE COURT:  Okay.  What do you think?  Do you see

23   anything on the defense side?

24         MR. BALLON:  No.  We don't need anything, your Honor.

25   We think that's a reasonable proposal.

1          Would the case be stayed --

2               **MS. ESQUENET:**  I just want to make sure I understand

3     that --

4               **THE COURT:**  That's what the "on ice" part meant.

5               **MS. ESQUENET:**  Sorry?

6               **THE COURT:**  That's what the "on ice" part meant.  I

7     would like you to try this without racking up fees in the

8     meantime.  That's my goal.

9          Now, if you tell me there is some reason you can't live

10    with that, then just tell me.  But this is the time to tell me.

11    Otherwise, I'm inclined to let you do everything you need to do

12    to help yourself and move forward to settlement.

13              **MR. BALLON:**  We don't, your Honor.  We don't need

14    anything.

15              **THE COURT:**  All right.

16              **MS. ESQUENET:**  No.  I think as long as we can pick

17    up, if this doesn't work.

18              **THE COURT:**  All right.  Now, if anything happens, you

19    just send me a letter.  Okay?  If there is a breakdown, like

20    you send another 300 or 500 links and you don't get a response

21    or you look three days later and they are still there,

22    Mr. Ballon stops returning your phone calls, whatever it was

23    that makes you unhappy, you just send me a letter and I will

24    give it prompt attention.

25              **MS. ESQUENET:**  Thank you, your Honor.

1          THE COURT:  In other words, if you think the

2    circumstances have changed in a way that make you

3    uncomfortable, you just let me know.  Okay?

4          MS. ESQUENET:  Yes.  Thank you.

5          THE COURT:  You're not being forced into anything.  I

6    think this is a great opportunity and I'm very happy you've

7    agreed to it.  If your circumstances change, you just let me

8    know and we'll revisit the issue.  Okay?

9          MS. ESQUENET:  Okay.

10         THE COURT:  And the same is true for defendants.  All

11   right?

12         MR. BALLON:  Okay.  Thank you, your Honor.

13         THE COURT:  So are we good with all that?

14         MR. BALLON:  Yes, your Honor.

15         THE COURT:  Okay.

16         MS. ESQUENET:  The only thing I would ask is if you

17   have any say with Judge Spero, the sooner the better because

18   our exam season is coming.

19         THE COURT:  I have zero say with him, but I will

20   impress upon him my heartfelt desire that he sees you soon.

21         MS. ESQUENET:  I appreciate that.

22         THE COURT:  I appreciate your position.

23      Okay?  All right.  Okay.  Thank you, everybody.

24      (Proceedings adjourned.)

25

**CERTIFICATE OF OFFICIAL REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_Debra L. Pas_

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Monday, December 4, 2017